# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID WILSON BECERRIL, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-1186 |
| | § | |
| RICHARD A. GUNNELS, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, a state inmate proceeding *pro se* and *in forma pauperis*, filed this civil rights lawsuit asserting claims against Texas Department of Criminal Justice ("TDCJ") officers Richard Gunnels, Norris Jackson, Bryan Buck, Lawrence Dawson, Frederick McCullough, and Lorrie Murray for failure to protect. Defendants filed a motion for summary judgment (Docket Entry No. 36), to which plaintiff responded (Docket Entries No. 44, 45.)

Based on consideration of the motion, the response, the record, and the applicable law, the Court GRANTS IN PART and DENIES IN PART the motion for summary judgment and ORDERS as follows.

### Background and Claims

Plaintiff alleges that, on May 11, 2009, inmate Bobby Parker, a member of the Crips prison gang at the Estelle Unit, stole commissary property from plaintiff's cell. When plaintiff confronted Parker about the missing property later that day, Parker struck him in the jaw. (Docket Entry No. 1, p. 12.) Plaintiff states that he reported the theft and assault to

defendant Murray the next morning; Murray found the stolen property in Parker's cell and charged Parker with extortion and assault.  Parker and plaintiff were placed in separate pre-hearing detention cells.  Plaintiff filed an OPI ("Offender Protection Investigation") request asking to be either placed in permanent protective custody or transferred to another unit because,

> Since this happen I have been threatened and labeled a snitch.  The person who knocked me out and stole or took my [property] is [a] crip member, told me him and his people would get at me and I would have to pay for anything officers lost or took from or out of his property.  I have been threatened by the Spanish now as well because I involved or told officers about what happen to me and what was taken from me.  I feel like I am in immediate danger for my life and well being[.]

(Docket Entries No. 1, p. 14; No. 36, Exhibit E, Part 1, p. 22.)  Plaintiff states that Murray initiated and investigated the OPI, which was then forwarded to defendant Gunnels, chairperson of the Estelle Unit Classification Committee ("UCC"), for the committee's review and decision.

Plaintiff alleges that, during the ensuing UCC meeting on May 18, 2009, he told Gunnels he had overheard Parker saying that Hispanic offenders and Crips members would "smash" or "drop" plaintiff when he was released back to his regular housing wing.  Plaintiff complains that, despite this new information, Gunnels denied him protective custody or a transfer, and said plaintiff had a history of being moved from unit to unit for similar reasons.  According to plaintiff, Gunnels told him he could not keep running and would eventually have to stand up and fight for himself.  (Docket Entry No. 44, pp. 9–10.)

2

The OPI records submitted by defendants contradict plaintiff's allegations in certain areas.  (Docket Entry No. 36, Exhibit E, pp. 8–12.)  According to the OPI, plaintiff reported the extortion incident to Murray a few hours after the theft, but did not report the assault until May 13, 2009, when he requested medical attention for his injured jaw and filed the OPI request.[1]  *Id.*, Part 3, p. 2.  Murray reported in the OPI that plaintiff requested medical attention on May 13th and told her that "he had no intention to report the incident, that he would take care of this his own way," but that he later "did not want to go back to segregation and decided to report the incident."  *Id.*, Part 1, p. 11.  In his handwritten portion of the OPI dated May 14, 2009, plaintiff stated that the assault had occurred on May *12*, 2009, late in the evening, and that he believed the incident occurred because of "money, size, and solo."  *Id.*, p. 9.

As part of her investigation, Murray questioned other inmates on the cellblock about the assault, and reported in the OPI that "they did not see anything transpire."  *Id.*  She also interviewed Parker.  Parker denied assaulting plaintiff and told her that plaintiff "owed [money to] several of the other guys on the wing and was trying to [get moved] off the

---

[1]Despite these and similar statements appearing in the record, defendants contend that the competent summary judgment evidence shows that plaintiff alerted Murray to the assault "early the next day."  (Docket Entry No. 36, p. 7.)  The Court notes that these conflicting dates in the OPI records may reflect the date the record entry was made, and not the date of the actual event.  These particular dates, however, are not relevant to the Court's disposition of the summary judgment motion.

wing." *Id*.  However, in an unsigned page appearing in the OPI records, an unidentified OPI

investigator reported the following:

> On 5-13-2009 the Investigation revealed that there had been a physical
> altercation between [sic] [Parker] in the H2 dayroom that was not seen by staff
> and not reported.  [Plaintiff] informed [Murray]  that he had [been] Extorted
> by [Parker] and was assaulted.  [Plaintiff] was examined by medical staff and
> no injuries were noted.  The medical staff ordered an x-ray of [plaintiff's] left
> jaw.  As far as Extortion, no evidence could be found.  [Parker] had receipts
> for all his purchases.  During my investigation [Parker] admitted to having a
> physical altercation with [plaintiff] in the H2 dayroom on May 13, 2009.
> [Parker] stated that he did hit [plaintiff] and then pushed him away after he had
> swung on him.  [Plaintiff] informed me that he was being extorted and never
> said anything about a fight.  He was asked if there were any threats made and
> he said no.  I asked if he owed [Parker] any commissary.  [Plaintiff] stated that
> he owed about $14.00 to Parker and told him he was going to pay him back but
> then said he wasn't going to pay him.  During the interview [plaintiff] stated
> he owed the commissary and was going to pay [Parker] back because it was
> right.  UCC reviewed the OPI and found no evidence of Extortion and released
> [plaintiff] back to G4 custody on 5-16-2009.

*Id*., Part 3, p. 2.

Murray again spoke with plaintiff on May 14, 2009, at which time he informed her

that Parker was attempting to communicate with him through other offenders on the wing.

*Id*.  That same day, plaintiff signed a statement informing Murray that, "The situation has

been resolved, and I no longer require protection/transfer.  I understand that the allegations

I made which resulted in the investigation will not be investigated unless new evidence is

presented that would warrant another investigation."  *Id*., p. 9.  In concluding the OPI,

Murray reported that, "Based on the information received at this time there is enough

information to determine that [plaintiff] did receive [an] injury however, by who or what cannot be determined." *Id*.

Plaintiff met with the Estelle UCC on May 18, 2009. Gunnels, as chairperson for the UCC, signed the UCC report which concluded that there was "no evidence to support [a] claim of life endangerment." As a result, plaintiff remained in his regular assigned housing. *Id*., p. 12. Gunnels made no mention of any new, specific threats disclosed by plaintiff. Defendants assert that the UCC's decision was mandated by the Safe Prison Plan's explicit warnings that predatory inmates should not be given access to safekeeping housing, as they often fabricated their own need for protection. (Docket Entry No. 36, p. 8; Exhibit F, pp. 11–12.)[2]

Plaintiff was released back to his regular housing wing on May 19, 2009. Plaintiff alleges that, at the chow hall later that morning, a few inmates began asking him what had happened, while others were hostile or made threats or promises. One inmate in particular threatened plaintiff with physical harm if Parker remained "locked up." Defendant McCullough noticed the commotion and told plaintiff to sit down at a table, which plaintiff did. A short while later, three inmate gang members surrounded plaintiff, but McCullough intervened and ordered them to leave. Plaintiff told McCullough about the assault and threats, but McCullough told plaintiff to leave the chow hall.

---

[2]Defendants do not assert, and nothing in the record suggests, that plaintiff was a "predatory inmate" under the Safe Prison Plan.

5

Plaintiff states that, around 4:30 that same afternoon, three inmate gang members assaulted him in the dayroom and broke his jaw.  He was transported to the hospital for surgical repair of the jaw.  Following surgery, he was sent to  a medical unit for three months for recovery, and was then returned to the Estelle Unit.

Defendants also submit a copy of the (second) OPI report regarding this subsequent incident of May 19, 2009.  (Docket Entry No. 36, Exhibit D, pp. 18–23.)  In the second OPI, plaintiff again requested protective custody or a unit transfer, based on his belief that the new incident had been in retaliation for his earlier OPI regarding the first incident.  *Id.*, p. 19. Plaintiff told the investigator, defendant McCullough, that he believed he would continue having these problems with gang members unless he was transferred elsewhere.  *Id.*, p. 21.

In an unsigned page appearing in the OPI records, an unidentified OPI investigator reported the following:

> On 5-19-2009 [t]here was a physical assault on [plaintiff] in the H2 dayroom by (3) three [b]lack offenders.  Offender[s] [Davis, Stevenson, and Butler] assaulted [plaintiff].  It should be noted that Offender Parker is affiliated with the CRIPS and Offender Davis is also affiliated with the CRIPS.  Offender[s] Stevenson and Butler are not suspected at this time but by their own admission they are close friends with Offender Parker.  It cannot be proven at this time but it is believed that the Tango did not like how [plaintiff] disrespected them by refusing to pay what he owed to Parker and claiming that he was being Extorted.  It is possible that the Hispanics said they would not step in if the CRIPS assaulted him.  It is possible that if [plaintiff] remains on the Estelle Unit he could be assaulted again.

(Docket Entry No. 36, Exhibit E, Part 3, p. 2.)  The record does not disclose the date the entry was made.  On August 21, 2009, the following update was added to the report:

6

> On 8-21-2009 [plaintiff] was seen by UCC and offender stated he had not received any threats yet.  [Plaintiff] has been involved in fights with confirmed Crips members and received injuries beyond first aid.  The offenders that were involved in the two assaults are still assigned to the Estelle Unit and did receive disciplinary punishment for the assault.  [Plaintiff] has four known enemies on the Estelle Unit at this time.

*Id*.  On August 21, 2009, the Estelle Unit UCC recommended that plaintiff be transferred to another unit due to the attack and plaintiff's claim that he still owed Parker money.  *Id*., Part 1, p. 15; Part 3, p. 16.  Plaintiff was subsequently transferred to another unit.

Plaintiff reports in his complaint that he "wrote a step one grievance about what had happened to him, holding warden Gunnels completely responsible," but the step one and ensuing step two grievances were denied.  (Docket Entry No. 1, p. 23.)  He also complains that his stolen commissary property was recovered but not returned to him.  Plaintiff claims that defendants were deliberately indifferent to his safety and failed to protect him from the second assault, despite his reports of threats and safety concerns.  He seeks monetary compensation for violation of his Eighth Amendment rights and for the value of the stolen property, and requests a permanent injunction ordering Estelle and/or McConnell Unit officials to assign him to safekeeping for the remainder of his eighteen-year sentence.

Defendants seek summary dismissal of plaintiff's claims based on failure to exhaust, failure to state a claim, Eleventh Amendment immunity, and qualified immunity.

*Analysis*

*Standard of Review*

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  A factual dispute will preclude a grant of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The trial court may not weigh the evidence or make credibility determinations.  *Id*.  Conclusory allegations, speculation, improbable inferences, or a mere scintilla of evidence, however, are insufficient to defeat a summary judgment motion.  *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 754–55 (5th Cir. 2000).

*Failure to Exhaust*

Plaintiff asserts the following Eighth Amendment claims for failure to protect against the following defendants:

(1)   Gunnels refused to transfer him or provide him protective custody after the first assault, despite plaintiff's reports of a threatened second assault;

(2)   Murray inadequately investigated the first assault and failed to file paperwork requesting plaintiff's placement in safekeeping;

(3)   Buck refused his request for safekeeping after the first assault, thus leaving him vulnerable for the second assault;

8

(4)    McCullough witnessed a verbal altercation between plaintiff and three other inmates at the chow hall on May 18, 2009, the day before the second assault, but did nothing more than ask them all to leave;

(5)    Dawson conspired with the other defendants to violate TDCJ's safe prison plan and refuse plaintiff protective custody after the first assault; and that

(6)    Jackson refused to assign him to safekeeping after the second assault, thus leaving him at risk for future assaults.

Defendants argue that plaintiff exhausted his failure to protect claims only as to defendant Gunnels, and that any claims against defendants Buck, Murray, Dawson, Jackson, and McCullough are unexhausted. While defendants acknowledge that plaintiff mentioned defendant Murray in his step 1 grievance, they contend plaintiff raised no claims against her in the grievance. Defendants move for summary judgment dismissal of plaintiff's claims against these five defendants for failure to exhaust.

A prisoner is required to exhaust administrative remedies through available prison administrative procedures regardless of the relief sought or offered. 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). A grievance is sufficient to exhaust administrative remedies "to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004). The grievance need not allege complete legal theories but must alert prison officials to the problem and provide them an opportunity to address it. *Id*. at 518. Proper exhaustion requires that a prisoner not only pursue all available avenues of relief but also comply with all administrative deadlines and procedural requirements.

9

*Woodford v. Ngo*, 548 U.S. 81, 89–93 (2006).  A prisoner cannot satisfy the exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal.  *Id.* at 83–84.  Failure to exhaust is an affirmative defense, and defendants bear the burden of pleading and proving that an inmate failed to exhaust his administrative remedies prior to filing suit.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010).  TDCJ inmates must pursue both step 1 and step 2 grievances to exhaust their claims.  *Johnson*, 385 F.3d at 515–16.

Plaintiff's step 1 grievance in the instant case grieved the incident of May 19, 2009, and complained of Gunnels's refusal to place him in safekeeping or take seriously the threats to his safety.  Defendant Murray's actions in locating the stolen commissary purchases were mentioned in the grievance, but no claims were lodged against her.  Nor did plaintiff voice any complaints against defendants Jackson, Buck, Dawson, or McCullough in the grievance. This comports with plaintiff's acknowledgment in his complaint that he was "holding warden Gunnels completely responsible," as he complained only of Gunnels's actions and inactions in the grievance.  (Docket Entry No. 1, p. 23.)  Plaintiff's step 2 grievance again complained of Gunnels's refusals to protect him, and mentioned that "also Mrs. Murray (Lt) investigated into the matter."  *Id.*, Exhibit, Step 2 Grievance.  However, because no claims against Murray had been raised in the step 1 grievance, any claim raised against her in the step 2 grievance provided no exhaustion.

Plaintiff alleges in his response to the motion for summary judgment that he was unaware of these other defendants at the time he filed his step 1 grievance. This argument, however, does not comport with the pleadings in his complaint. Plaintiff was aware of Jackson's involvement no later than the date plaintiff received his response to the step 1 grievance, as Jackson signed the grievance response. (Docket Entry No. 1, p. 6; Exhibit, Step 1 Grievance.) Moreover, plaintiff was well aware of McCullough's involvement, as it was McCullough who ordered plaintiff and the three other inmates to leave the chow hall prior to the second assault. (Docket Entry No. 1, pp. 18–19.) Plaintiff does not show that he subsequently pursued a step 1 grievance against Jackson or McCullough. Moreover, plaintiff's factual allegations show that he was aware of Murray's involvement throughout the course of events, yet no step 1 grievance claims were brought against her. Plaintiff alleges in his complaint that defendant Buck "was over the safe prison program for the Estelle Unit" where the assaults occurred, and was involved in the decision to deny plaintiff protective custody. *Id.*, p. 7. Plaintiff does not show that he subsequently pursued a step 1 grievance against Buck. Similarly, plaintiff asserts that Dawson, security captain at the Estelle Unit, "sat on the Unit Classification Committee" and conspired with Gunnels to violate the safe prison program plan by denying plaintiff protective custody. Plaintiff does not show that he subsequently pursued a step 1 grievance against Dawson as to these claims.

11

Plaintiff did not exhaust his claims against defendants Jackson, Buck, Dawson, Murray, and McCullough through the step 1 and step 2 prison grievance system, and his claims against those defendants are DISMISSED for failure to exhaust.

*Loss of Commissary Purchases*

Plaintiff seeks recovery of monetary compensation for his stolen commissary property that was recovered but not returned to him.

Texas provides a remedy for inmates whose property has been taken or destroyed in an unauthorized manner. *See Myers v. Klevenhagen*, 97 F.3d 91, 95 (5th Cir. 1996); TEX. GOV'T CODE §§ 501.007, 501.008. Because Texas provides an adequate post-deprivation remedy, plaintiff's claim that his property was wrongfully or negligently lost or destroyed has no basis in federal law. *See Murphy v. Collins*, 26 F.3d 541, 543-44 (5th Cir. 1994). Accordingly, plaintiff has failed to state a claim for which relief can be granted under section 1983, and his claim for monetary compensation for the loss of his property is DISMISSED WITHOUT PREJUDICE to plaintiff's pursuing relief in an appropriate state court.

*Eleventh Amendment Immunity*

Plaintiff's claims for monetary damages against defendants in their official capacity are barred by the Eleventh Amendment. *See Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Because a suit brought against a state official in his official capacity is, in reality, a suit asserted against the state itself, the suit is barred. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Howlett v. Rose*, 496 U.S.

12

356, 365–66 (1990).  Accordingly, defendants' motion for summary judgment dismissal of plaintiff's claims for monetary damages against the defendants in their official capacities is GRANTED, and the claims are DISMISSED WITH PREJUDICE.

*Deliberate Indifference and Qualified Immunity*

Plaintiff's claim that Gunnels failed to protect him from the second assault constitutes a claim for failure to protect or deliberate indifference to his safety needs under the Eighth Amendment.  Gunnels claims entitlement to qualified immunity on this claim.

The Eighth Amendment proscription against cruel and unusual punishment requires prison officials to protect inmates from violent attacks by other inmates.  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  However, not every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety.  *Id*. at 834.  In order for prison officials to be held liable under the Eighth Amendment for a failure to protect, a prisoner must prove that the official knew of and disregarded an excessive risk to the inmate's safety; was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and also drew the inference; and failed to take reasonable remedial action.  *Id*. at 842–45.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as infliction of punishment."  *Id*. at 826.  Furthermore, the mere negligent failure to protect a prisoner from assault does not

13

constitute a constitutional violation unless it becomes pervasive. *Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986); *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990).

State officials acting within the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects government employees against civil liability in their individual capacity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009). Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable under the circumstances presented in the case. *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007). Thus, the doctrine of qualified immunity shields from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To determine whether a state official is entitled to qualified immunity for an alleged constitutional violation, reviewing courts engage in a two-prong inquiry. *Pearson v. Callahan*, 555 U.S. 223 (2009). Under the first prong, the court asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right that was "clearly established" at that time. *Id.*, 555 U.S. at 231; *Scott v. Harris*, 550 U.S. 372, 377 (2007). The second prong of the analysis requires the court to ask whether qualified immunity is appropriate, notwithstanding an

alleged violation, because the defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007). The reviewing court may consider these prongs in any sequence. *Pearson*, 555 U.S. at 235.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. *Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct. *Id.*; *see also Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (noting that, to avoid summary judgment on qualified immunity, a plaintiff need not present absolute proof, but must offer more than mere allegations).

The probative summary judgment evidence here raises a material fact issue as to whether Gunnels was deliberately indifferent to plaintiff's safety needs in not recommending or authorizing a change in his housing or unit assignment. Gunnels was given the first OPI with Murray's investigations, and plaintiff states that he himself specifically informed Gunnels that ethnic and gang groups had threatened to cause him physical injury upon his

15

return to his regular housing wing. Plaintiff states that Gunnels told him that he could not keep running and would eventually have to stand up and fight for himself, and returned him to his regular housing wing. The same day plaintiff was returned to his regular housing, he was assaulted by gang members or associates who broke his jaw. Gunnels is not entitled to summary judgment dismissal of plaintiff's Eighth Amendment claim against him.

Gunnels argues that, even assuming there was a constitutional violation, he nevertheless is entitled to qualified immunity because he acted in good faith and plaintiff does not show that Gunnels's actions in denying him safekeeping or a transfer were objectively unreasonable under the circumstances. To avoid summary judgment on the second prong of the qualified immunity defense, plaintiff must present evidence to raise a material fact issue as to whether Gunnels acted in an objectively reasonable manner in view of the existing law and facts available to him. *See Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993). If reasonable state officials could differ as to whether Gunnels's actions were lawful, Gunnels is entitled to qualified immunity as well as summary judgment dismissal of plaintiff's claims against him. *See Malley*, 475 U.S. at 341.

Gunnels has not provided the Court with an affidavit regarding his actions in this case, thus the Court must look to plaintiff's factual assertions as well as matters appearing in the OPI and other records submitted by defendants. Plaintiff clearly states he told Gunnels at the UCC hearing on May 18, 2009, that he had overheard Parker saying that Hispanic and gang offenders had agreed to "smash" or "drop" plaintiff when he was returned to regular housing.

16

According to plaintiff, Gunnels told him he had a history of being moved from unit to unit for reasons similar to his instant assertions, and that he could not keep running and would eventually have to stand up and fight for himself.  Defendants' records show that plaintiff's protection request was denied due to "no evidence to support claims of life endangerment." (Docket Entry No. 36, Exhibit C, p. 19, "Previous Protection Request Facts.")

In urging that defendants, and thus Gunnels, are entitled to qualified immunity, defendants state little more than the following:

> Defendants' actions with regard to Plaintiff were reasonable.  All of Plaintiff's claims of life endangerment and failure to protect were thoroughly investigated.  All classification decisions were made in good faith and in reliance on the evidence before the committees.  All actions taken with regard to Plaintiff were taken with strict adherence to applicable policies and procedures.

(Docket Entry No. 36, p. 13.)  Defendants conclude that, "[B]ecause [plaintiff] has not demonstrated that Defendants' actions were objectively unreasonable, Defendants' entitlement to qualified immunity is preserved."  *Id*.  In support, defendants refer the Court to Exhibits D and E, *in toto*, and pages 9 through 23 of Exhibit F, TDCJ's Safe Prison Plan. Gunnels's involvement with the events reported in Exhibits D and E appear limited to his participation in, or the making of, the decision not to change plaintiff's housing or unit assignment, which is the basis of plaintiff's Eighth Amendment claim against him.  Exhibit F sets forth general procedures and policies regarding inmate altercations and threat

complaints, but explains neither the specific procedures utilized by Gunnels in plaintiff's particular case nor the basis for his decision not to change plaintiff's housing assignment.

Defendants present no argument or facts specific to the reasonableness of Gunnels's conduct, and Gunnels himself provides no information for the Court's consideration regarding his own conduct.  Given that this Court is required to view the facts in the light most favorable to plaintiff, the Court notes that plaintiff informed Gunnels of a specific threat to his safety relative to his housing assignment, and that Gunnels denied a housing change, telling plaintiff he would have to stop running and eventually stand up and fight for himself.  Plaintiff's jaw was broken the next day under the very circumstances plaintiff had reported to Gunnels.  In context of the chronology of events known to Gunnels through his review of the OPI reports and plaintiff's disclosures to him of specific threats, it cannot be said that his response to plaintiff's situation was objectively reasonable.  Plaintiff raises a genuine issue of material fact as to whether Gunnels's response was objectively unreasonable.

Therefore, the Court finds that plaintiff has rebutted Gunnels's affirmative defense of qualified immunity by showing the existence of a disputed fact issue regarding the objective unreasonableness of Gunnels's conduct.  Gunnels's motion for summary judgment is DENIED as to his entitlement to qualified immunity.

*Injunctive Relief*

Plaintiff seeks a permanent injunction ordering Gunnels, as warden of the Estelle Unit, to house him in safekeeping or protective custody for the remainder of his eighteen-year sentence.  He argues that, as long as he remains in TDCJ custody, he will be vulnerable to future assaults by Parker's gang member friends or associates, or by other Hispanics and prison gangs because he has been labeled a "snitch."

Plaintiff is no longer housed at the Estelle Unit, and he shows neither a "demonstrated probability" nor a "reasonable expectation" that he will be transferred back to the Estelle Unit.  *See Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002).  At the very least, any suggestion of relief based on the possibility of transfer back to [the Estelle Unit] is too speculative to warrant relief.  *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001).  As a result, plaintiff's claims regarding his alleged vulnerability at the Estelle Unit have been rendered moot.

For these same reasons, any claim plaintiff has raised against defendant Jackson for permanent protective custody at the McConnell Unit is moot, as plaintiff is no longer housed at the McConnell Unit and he shows neither a "demonstrated probability" nor a "reasonable expectation" that he will be transferred back to the McConnell Unit in the foreseeable future.

Further, even assuming proper parties were before the Court in order to grant such relief, plaintiff presents nothing beyond speculation that he remains subject to future assaults at other prison units due to the incidents made the basis of this lawsuit.  Plaintiff's fear that

19

he may be injured in the future at other prison units is speculative at this point, and permanent injunctive relief will not be granted based on the speculative possibility of future harm. *See Geiger v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2005).

Plaintiff's request for permanent injunctive relief is DENIED.

*Conclusion*

The Court ORDERS as follows:

(1)   Defendants' motion for summary judgment (Docket Entry No. 36) is GRANTED IN PART and plaintiff's claims against Norris Jackson, Bryan Buck, Lawrence Dawson, Frederick McCullough, and Lorrie Murray are DISMISSED for failure to exhaust.

(2)   Defendant's motion for summary judgment (Docket Entry No. 36) is FURTHER GRANTED IN PART and plaintiff's claims for monetary compensation for the loss of his commissary property is DISMISSED WITHOUT PREJUDICE for failure to state a claim under section 1983.

(3)   Defendant's motion for summary judgment (Docket Entry No. 36) is FURTHER GRANTED IN PART and plaintiff's claims against the defendants in their official capacities are DISMISSED as barred by Eleventh Amendment immunity.

(4)     Defendants' motion for summary judgment (Docket Entry No. 36) is DENIED as to plaintiff's claims against Richard Gunnels.

(5)     Permanent injunctive relief as to plaintiff's housing at the Estelle Unit and/or McConnell Unit is DENIED AS MOOT.

(6)     The Court will enter a separate scheduling order setting this case for trial.


THIS IS AN INTERLOCUTORY ORDER.

The Clerk will provide copies of this order to the parties.

Signed at Houston, Texas on September 30, 2011.

_____
Gray H. Miller
United States District Judge